IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | CRIMINAL INDICTMENT NO.: |
| | : | 2:15-CR-00015-RWS-JCF |
| BRITTANY ENO | : | |

### REPORT AND RECOMMENDATION

This case is before the Court on Defendant's Motion To Suppress Defendant's Statements (Doc. 28) and Motion To Suppress Fruits Of Unlawful Searches (Doc. 29). For the reasons discussed below, it is **RECOMMENDED** that Defendant's motion to suppress statements be **GRANTED** and her motion to suppress evidence be **DENIED**.

### Procedural History

An Indictment filed on April 21, 2015 charges Defendant Brittany Eno and her co-defendant Jason Evans with conspiracy to possess with intent to distribute methamphetamine (Count One) and possession with intent to distribute methamphetamine (Count Two). Defendant filed a motion to suppress statements she made to law enforcement officers on November 6, 2014 (Doc. 28) and a motion to suppress evidence seized without a search warrant on November 6, 2014 (Doc. 29). On August 11, 2015, the Court conducted a hearing on Defendant's

1

motions (*see* Doc. 30), and a transcript[1] of that hearing was filed on August 26, 2015 (Doc. 31).  The Government filed a post-hearing brief on September 30, 2015 (Doc. 36), and Defendant submitted a post-hearing brief on October 28, 2015 (Doc. 39).  With briefing now complete, the undersigned considers the merits of Defendant's motions.

## **Facts**[2]

On November 4, 2014, Jeffrey Shull, a Hall County Sheriff's Office narcotics agent assigned to the Multi-Agency Narcotics Squad ("MANS unit") for the past 15 years, began an investigation into Jason Evans.  (Tr. 6).  The investigation began when a confidential source ("CS") reported that he had received methamphetamines from Evans in the past and could order methamphetamine from him.  (Tr. 7).  The CS had provided information in the past "but [the CS] had not been used in a deal at that point."  (Tr. 7).  Agent Shull ran Evans's identifying information through dispatch and determined that there was an active arrest warrant out on him.[3]  (Tr. 10).

The CS then made phone calls to Evans on November 4th and arranged to meet Evans on that day at the Title Max in Oakwood, Georgia "to help sign on a

---

[1] References to that transcript will be designated as "Tr. __."
[2] These facts are taken from the testimony of Hall County Sheriff's Office Multi-Agency Narcotics Squad ("MANS unit") Agent Jeffrey Shull at the August 11, 2015 hearing.
[3] Shull did not identify the basis for the outstanding arrest warrant.  (*See* Tr. 10).

2

loan for a Mustang Cobra and also Mr. Evans was going to sell the [CS] 2 ounces of methamphetamine." (Tr. 7, 9). The CS explained that he had previously traded a Ford Mustang Cobra to Evans in exchange for 9 ounces of methampthetamine and a Mercedes convertible. (Tr. 9, 23). Agent Shull was present during these calls and could hear the conversations either because the calls were on speaker phone or because he sat close enough to the CS to be able to hear. (Tr. 7-8). The November 4th meeting did not occur because Evans told the CS that the Mustang "was acting up and had broken down and that the meeting would have to be delayed due to that fact." (Tr. 8). The CS called Evans two to four times on November 6th and reset the meeting with the same terms, i.e., to meet at the Title Max in Oakwood that afternoon, where the CS would purchase 2 ounces of methamphetamine from Evans and would sign the Title Max loan for the Mustang. (Tr. 8-10, 23). Agent Shull was also present during these calls, which occurred at the MANS office, and he could hear the content of the conversations. (Tr. 8-9).

    The CS described the Mustang to Shull and gave him a tag number, a specialized tag that read "S-L-V-S-N-K." (Tr. 9-10). The CS also told Shull that Evans had a girlfriend, that she had been with him "on numerous deals," and that she would be there that day. (Tr. 11-12). He also told Shull "that it was very common for Mr. Evans to have a handgun on his person when he did deals." (Tr. 12). Agent Shull confirmed on that date that the arrest warrant on Evans was still

active. (Tr. 10). Shull also searched the CS's vehicle and the CS and then followed the CS to the Title Max. (Tr. 11). Other agents had already gone to the Title Max to set up surveillance. (Tr. 11). While on the way, Shull received a call from the CS, who told him that Evans had called and said that he was at the Auto Zone across the street from the Title Max. (Tr. 11). Shull directed the CS not to go to that location and to move where he would not be seen. (Tr. 11). Shull instructed the other agents to set up surveillance at the Auto Zone and look for the silver Ford Mustang Cobra. (Tr. 11).

When Shull arrived at the Auto Zone, he observed the Mustang with its hood up parked next to a red Toyota Celica; no one was in either vehicle. (Tr. 12). Shull advised the other agents to look for Evans and "a possible female that could be with Mr. Evans." (Tr. 12). Shull then saw Evans and Defendant come out of the Auto Zone and walk to the Celica. (Tr. 13). Once Defendant got in the passenger side and Evans got in on the driver's side, they closed the doors. (Tr. 13). Shull was familiar with Evans from a prior methamphetamine drug case and Shull also had looked Evans up on the Criminal Justice Information System ("CJIS"), which the Hall County Sheriff's Office uses "to catalogue arrests of subjects and the booking of them into the Hall County Detention Center," to review Evans's appearance so that he recognized Evans upon seeing him at the Auto Zone. (Tr. 13, 17-18). Shull then called for the other units to move in and

detain Evans and Defendant because he "didn't want them to get out on the roadway." (Tr. 13). The agents moved in, and Shull used his vehicle to block the rear of the Celica while activating his blue lights. (Tr. 13-14).

The agents yelled at the occupants to unlock the doors, and Shull went to the passenger's side where Defendant was seated. (Tr. 14). Evans had one hand on the gearshift and one on the steering wheel and "kept looking around like he was looking for an avenue for escape," and he did not unlock his door. (Tr. 14-15). Shull got Defendant's attention and "yelled at her to unlock the door," and she complied. (Tr. 14-15). Shull opened the door and removed Defendant, who was then handcuffed by other agents. (Tr. 15). Shull slid into the passenger's seat, at which time Evans unlocked his door, and agents removed him from the vehicle and handcuffed him. (Tr. 15). Shull had advised the agents that Evans had recently had back surgery and to keep that in mind when handcuffing him to keep him from being injured. (Tr. 15). Evans was searched at that time, and Defendant was searched later. (Tr. 15).

While Evans was lying about a foot from the open door of the car being handcuffed,[4] Shull "immediately searched the area around where [Evans] was seated," including the center console "where a firearm could easily be hidden."

---

[4] Evans was not immediately required to stand up because he claimed his back hurt, so the agents called an ambulance; Evans was taken to the hospital and then to the jail. (Tr. 20-21, 24).

5

(Tr. 16, 23-24). Shull "could see a black bag that was partially unzipped and [he] could see what appeared to be drug contraband in that bag," i.e., "a pipe and maybe a small Ziploc baggy that was partially hanging out the bag." (Tr. 16). Shull opened the bag and saw "a pill bottle that contained alprazolam pills of different sorts," seven bags of methamphetamine, a set of scales, packaging materials, "and other drug items." (Tr. 16-17). The vehicle was then searched further, and a crushed meth pipe was found under the backseat, and Defendant's purse was searched to obtain identification and to look for weapons and contraband, and the agents found a small bag of marijuana in the purse. (Tr. 17). The title to the Mustang was also found in the purse.[5] (Tr. 17). The agents then searched the Mustang, and found some pills and a small burnt marijuana cigarette but no methamphetamine.[6] (Tr. 17).

## Discussion

**I.     Motion To Suppress Evidence (Doc. 29)**

Defendant contends that any evidence seized from the Toyota Celica, including that found in her purse, should be suppressed because it was seized

---

[5] Defendant points out that "[t]he CS also never signed the title of the Mustang over to Mr. Evans, which was the linchpin of this alleged deal between the CS and Mr. Evans" (Doc. 39 at 9), but that fact is immaterial as Evans was arrested before the deal could occur.

[6] Defendant was not charged with any offenses related to the items found in the Mustang, and therefore, the focus of this motion to suppress is on the search of the Celica. (*See* Tr. 4).

pursuant to an unreasonable search in violation of the Fourth Amendment. (*See* Doc. 39 at 4-12). The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ." U.S. Const. amend. IV. "The 'ultimate touchstone of the Fourth Amendment is reasonableness.' " *United States v. Walker*, 799 F.3d 1361, 1363 (11th Cir. 2015) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). "In most circumstances, unless there is consent, police officers must obtain a warrant supported by probable cause to justify a search under the Fourth Amendment." *United States v. Alston*, 598 Fed. Appx. 730, 733 (11th Cir. 2015) (unpublished decision). "There are, however, several established exceptions to the warrant requirement," two of which are implicated in this case: "(1) a search of a vehicle incident to a lawful arrest of a recent occupant ('search incident to arrest exception'), [and] (2) a search based on probable cause to believe than an operational vehicle contains evidence of criminal activity ('automobile exception')." *Id.* Where a seizure is made without a warrant, the burden is on the government to "demonstrate that the challenged action falls within one of the recognized exceptions to the warrant requirement, thereby rendering it reasonable within the meaning of the fourth amendment." *United States v. Freire*, 710 F.2d 1515, 1519 (11th Cir. 1983).

Here, Agent Shull's initial opening of the console was justified under the search incident to arrest exception, which allows officers to search a vehicle incident to a lawful arrest[7] "when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search." *Arizona v. Gant*, 556 U.S. 332, 343 (2009).[8] The "search incident to a lawful arrest . . . exception derives from interests in officer safety and evidence preservation that are typically implicated in arrest situations." *Id.* at 338. In *Gant*, the Court held that officers cannot search a vehicle "incident to a recent occupant's arrest after the arrestee has been secured and cannot access the interior of the vehicle." *Id.* at 335. The defendant in that case was handcuffed and seated in a locked patrol car when his car was searched, and "clearly was not within reaching distance of his car at the time of the search." *Id.* at 336, 344. The Court found that "[b]ecause police could not reasonably have believed either that Gant could have accessed his car at the time of the search or that evidence of the offense for which he was arrested might have been found therein, the search in this case was unreasonable." *Id.* at 344.

---

[7] Defendant does not challenge the lawfulness of Evans's arrest; the uncontroverted testimony is that there was an active arrest warrant that authorized his arrest. (*See* Tr. 10).

[8] Officers may also conduct a warrantless search of a vehicle incident to arrest "when it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.' " *Gant*, 556 U.S. at 343 (quoting *Thornton v. United States*, 541 U.S. 615, 632 (2004)). The parties did not address whether that was the case here.

In this case, Agent Shull testified that the CS had told him "that it was very common for Mr. Evans to have a handgun on his person when he did deals" (Tr. 12), so Shull reasonably opened the console next to the driver's seat to look for weapons while Evans was being handcuffed only a foot away from the open car door. (Tr. 23-24). Unlike the defendant in *Gant*—who was handcuffed and sitting in a locked patrol car when the search of his vehicle occurred—Evans was not yet secured and was within reach of the passenger compartment at the time Shull opened the console and "could see what appeared to be drug contraband in that bag," i.e., "a pipe and maybe a small Ziploc baggy that was partially hanging out the bag." (Tr. 16). The fact that the agents were in the process of handcuffing Defendant as Shull opened the console to make sure no weapons were inside does not render Shull's action unreasonable, particularly in light of the CS's report about Evans being armed during prior deals, Evans's actions in putting one hand on the gearshift and one hand on the steering wheel in a possible attempt to drive away when confronted by law enforcement, Evans's failure to immediately comply with the agents' instructions to unlock his door, Evans's proximity to the open door at the time Shull opened the console, and the presence of Evans's passenger (Defendant) who agents were also securing. Under these circumstances Agent Shull could reasonably have believed that Evans could have accessed his car at the time he opened the console to make sure it did not have a weapon. *See, e.g.*,

*United States v. Lewis*, No. CR415-091, 2015 U.S. Dist. LEXIS 87993, at *7-8 n.4 (S.D. Ga. July 1, 2015) (finding that officers reasonably began searching the defendant's vehicle where they had reason to believe that he was armed, even though the officers had removed him from the vehicle and were frisking him because "[h]owever unlikely, there remained the possibility that the defendant could break free from the officers, seize a weapon from the vehicle, and endanger their safety"), *adopted by* 2015 U.S. Dist. LEXIS 120195 (S.D. Ga. Sept. 9, 2015). In *Lewis*, the court further explained that "*Gant* did not hold that 'an arrestee who is restrained in some fashion by law enforcement necessarily is secured,' " and that "even the application of handcuffs does not eliminate the possibility that the arrestee 'might gain possession of a [close-at-hand] weapon or destructible evidence' " (quoting *United States v. Perdoma*, 621 F.3d 745, 750, 752)).

In addition, the automobile exception to the warrant requirement authorized the agents' subsequent search of the Celica, including the bag found within the console and Defendant's purse.[9] That exception "allows the police to conduct a search of a vehicle if (1) the vehicle is readily mobile; and (2) the police have probable cause for the search." *United States v. Lindsey*, 482 F.3d 1285, 1293

---

[9] "*Gant* placed limitations on searches incident to arrest; it did not affect the longstanding law regarding the automobile exception to the search warrant requirement." *United States v. Ilonzo*, No. 1:12-CR-276-SCJ-GGB, 2015 U.S. Dist. LEXIS 136783, at *49 (N.D. Ga. May 18, 2015), *adopted by* 2015 U.S. Dist. LEXIS 135895 (N.D. Ga. Oct. 6, 2015).

(11th Cir. 2007). "[O]fficers can [also] search any container in an operational car without a warrant as long as they have probable cause to believe that the container holds evidence of a crime." *United States v. Magluta*, 418 F.3d 1166, 1182 (11th Cir. 2005). "The mobility requirement is satisfied whenever the vehicle to be searched is operational." *United States v. Garcia*, 433 Fed. Appx. 741, 744 (11th Cir. 2011) (unpublished decision) (citing *United States v. Watts*, 329 F.3d 1282, 1286 (11th Cir. 2003)). "A functioning vehicle is considered to be 'mobile' even if it already has been secured by the police." *Id.* (citing *Michigan v. Thomas*, 458 U.S. 259, 261 (1982) and *United States v. Birdsong*, 982 F.2d 481, 483 (11th Cir. 1993)). "Police have probable cause to search a vehicle when under the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in the vehicle." *Id.* (internal quotations omitted).

Defendant concedes that the Toyota Celica "was easily identifiable as mobile because it was operational." (Doc. 39 at 8). Defendant correctly asserts that "the case at bar hinges on whether there was probable cause to believe that the car contained drug related contraband." (*Id.*). The undersigned finds that there was. Agent Shull received information from the CS about his prior drug deals with Evans, including the transfer of a Ford Mustang Cobra from the CS to Evans, that Evans usually had a gun with him during those transactions, and that he was accompanied by his girlfriend. (Tr. 7, 9, 11-12, 23). The CS described the

Mustang, including the license tag number, to Shull. (Tr. 9-10). Shull was familiar with Evans from a prior drug investigation, knew that Evans had an active arrest warrant on him, and knew what Evans looked like from looking him up on Hall County's CJIS. (Tr. 10, 13, 17-18). Shull had listened to the CS's multiple conversations with Evans during which CS and Evans arranged to meet in order for the CS to purchase methamphetamine from Evans, and for the CS to assist Evans in obtaining a title loan on the Mustang.[10] (Tr. 7-10, 23). The CS told Shull that Evans changed the meeting location to an Auto Zone, and Shull then observed Evans at the Auto Zone with a woman, which was consistent with the CS's report that Evans usually had his girlfriend with him during their transactions and that she would be there that day. (Tr. 11-13). Shull also observed, parked next to the Celica that Evans and Defendant were in at the Auto Zone, the Mustang with its hood up, which was consistent with what Evans had told the CS about the Mustang having mechanical problems. (Tr. 8, 12). When the agents confronted Evans and Defendant, Evans did not initially comply with their directives to unlock his door, and he appeared to be preparing to try to drive away. (Tr. 14-15). Finally, when Shull opened the console of the Celica, he observed items consistent with drugs,

---

[10] Defendant asserts that "Agent Shull has conceded that he did not listen on speaker to every conversation between Mr. Evans and the CS" (Doc. 39 at 10), but Shull testified that during the conversations that were not on speaker, he sat close enough to the CS to be able to hear the conversations. (Tr. 7-9).

including "a pipe and maybe a small Ziploc baggy that was partially hanging out the bag." (Tr. 16).

Given the totality of these circumstances, the undersigned finds that the agents had probable cause to search the Celica for drug-related contraband. *See, e.g.*, *United States v. Allen*, 353 Fed. Appx. 352, 354-55 (11th Cir. 2009) (unpublished decision) (finding that "police officers had probable cause to believe that Smith's car contained cocaine base that Smith intended to sell to a CS" based on the government agent's testimony that a CS brokered a transaction with the defendant via telephone, and when the defendant showed up at the agreed upon location, "the investigators could have reasonably believed that there was a fair probability that Smith's vehicle contained cocaine base that he intended to sell to the CS"); *see also Alston*, 598 Fed. Appx. at 734 (finding that officers had probable cause to search vehicle where an informant set up a drug transaction with the defendant, the defendant arrived at the agreed upon location, and an officer viewed a "wad of cash" in the vehicle when they arrested the defendant's passenger, "consistent with what he had seen in other drug investigations"). Moreover, because the agents here had probable cause to search the Celica for evidence of drug-related contraband, they were allowed to search areas where such evidence could be found, such as the bag in the console, underneath the seats, and Defendant's purse. *See, e.g.*, *Alston*, 598 Fed. Appx. at 734 ("Because probable

cause existed to search the vehicle for evidence of drug-trafficking activity, officers were allowed to search areas where the two guns were found—the glove compartment and the area under the driver's seat.").

Defendant challenges the reliability and veracity of the information provided by the CS to establish probable cause. (*See* Doc. 39 at 9-12). But in *Allen*, the court rejected the defendant's argument that the CS was unreliable where "the investigators recorded a phone conversation in which the CS and Smith set up the drug transaction that was supposed to occur later in the day," and therefore, "the investigators had independent means to corroborate the CS's information about this planned drug transaction, and Smith's appearance further supported the CS's veracity as to this series of events." *Id.* at 355. "In short, because the investigators could reasonably believe that Smith was arriving at the Hwy. 17/State Bridge gas station to sell the CS cocaine base, they had probable cause to search Smith's car[.]" *Id.*[11]

---

[11] Based on the similar corroboration of the CS's reports concerning the planned drug transaction in this case, the court's discussion in *Allen* indicates that probable cause to search the vehicle existed even before Agent Shull opened the console and observed the pipe and baggy, thus negating the need to rely on the search incident to arrest exception. Nevertheless, the undersigned finds that Agent Shull was authorized to open the console while Evans was near the vehicle being handcuffed to make sure that it did not hold any weapons Evans could use to hurt the agents.

Because the agents had probable cause to search the Toyota Celica and containers therein, including Defendant's purse, the undersigned **RECOMMENDS** that Defendant's motion to suppress evidence be **DENIED**.

## II.     Motion To Suppress Statements (Doc. 28)

Defendant moves to suppress any post-arrest statements she made to law enforcement officers on November 6, 2014 or thereafter on the grounds that they were obtained in violation of her right to counsel, which she unambiguously invoked, and that they "were not voluntary and . . . were [obtained] by threats and intimidation and offer[s of] . . . a benefit or reward." (*See* Doc. 28 at 2-4). At the August 11, 2015 hearing on Defendant's motions, the Government represented that "[a]fter reviewing [Defendant's] recorded statement, it does appear that there was an invocation of Ms. Eno's right to have an attorney present.  So the Government will concede that motion at this time." (Tr. 3).  Based on that concession, the undersigned **RECOMMENDS** that Defendant's motion to suppress her statements (Doc. 28) be **GRANTED**.

### Summary

For the reasons discussed above, it is **RECOMMENDED** that Defendant's Motion To Suppress Statements (Doc. 28) be **GRANTED.**  It is further **RECOMMENDED** that her Motion To Suppress Fruits Of Unlawful Searches (Doc. 29) be **DENIED**.

**IT IS SO ORDERED, REPORTED AND RECOMMENDED** this <u>2nd</u> day of <u>December</u>, 2015.

                                           <u>/s/ *J. Clay Fuller*</u>
                                           J. CLAY FULLER
                                           United States Magistrate Judge